UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

V.                                          NO. 12-01

TELLY HANKTON ET AL.                        SECTION "F"

<u>ORDER & REASONS</u>

Before the Court are six post-conviction motions: 1) Telly Hankton's motion for acquittal; 2) Telly Hankton's motion for a new trial; 3) Kevin Jackson's motion for acquittal; 4) Kevin Jackson's motion for a new trial; 5) Andre Hankton's motion for acquittal; and 6) Andre Hankton's motion for a new trial. For the following reasons the motions are DENIED.

## **Background**

After a three week trial and nearly three days of deliberation, a twelve-member jury convicted each of the four defendants who went to trial in this case – Telly Hankton, Walter Porter, Kevin Jackson, and Andre Hankton – of committing federal crimes. All were convicted of at least one count of murder.

On June 19, 2014 the government's third superseding indictment charged 13 defendants with 24 counts of federal crimes arising from the alleged activity of a criminal enterprise operating in the Central City neighborhood of New Orleans. Nine of the defendants pled guilty before trial. The four remaining defendants were convicted on various counts. Three of those four

1

defendants, Telly Hankton, Kevin Jackson, and Andre Hankton, now seek post-conviction relief, moving the Court for judgments of acquittal and for new trials. The story of the so-called Hankton gang was vividly fact-specific.

According to the government, Telly Hankton was the leader of a criminal enterprise engaged in drug distribution, public bribery, and murder. His cousin, Kevin Jackson, allegedly served as a drug distributor and gunman for the organization. The two were charged in Count 1 of the indictment, with conspiracy to violate federal racketeering (RICO) laws. Count 2 charged both Telly Hankton and Kevin Jackson with conspiracy to distribute large quantities of crack cocaine, powder cocaine, heroin, and marijuana. Count 3 charged Telly Hankton, Kevin Jackson, and Telly Hankton's other cousin, Andre Hankton, with conspiracy to use, carry, and possess firearms.  All three were charged in murder counts as well.

In Counts 5 and 6, Telly Hankton was charged with the murder of Darvin Bessie. Specifically, Count 5 charged him with murder in aid of racketeering, and Count 6 charged him with causing death through the use of a firearm in furtherance of the RICO and drug conspiracies. In Counts 7 and 8, Telly Hankton and Andre Hankton were charged for the murder of Darnell Stewart, again in aid of racketeering and through the use of a firearm. Counts 10 and 11 charged Telly Hankton, Kevin Jackson, and Walter Porter with the

murder of Jesse Reed in aid of racketeering and through the use of a firearm. Counts 15 and 16 charged Telly Hankton, Walter Porter, and Thomas Hankton with the attempted murder of John Matthews. Specifically, Count 15 charged those three with aggravated assault with a firearm in aid of racketeering, and Count 16 charged them with using and carrying a firearm in relation to a crime of violence and drug trafficking crime. Importantly, all three – Telly Hankton, Andre Hankton, and Kevin Jackson - were also charged with aiding and abetting in the commission of the murders for which they were charged.[1]

The jury found all of the defendants guilty on various counts. Telly Hankton was convicted on all counts except Counts 15 and 16 – those related to the attempted murder of John Matthews. The jury found Kevin Jackson guilty of the RICO conspiracy in Count 1 and the murder of Jesse Reed in aid of racketeering in Count 10. Jackson was acquitted of the drug conspiracy in Count 2, the firearms conspiracy in Count 3, and causing Jesse Reed's death through the use of a firearm in Count 11. The jury found Andre Hankton guilty of the firearms conspiracy in Count 3, causing the death of Darnell Stewart through the use of a firearm in Count 8,

---

[1] In addition to the conspiracy and murder charges, Andre Hankton was charged in Count 9 with possession of a short-barrel shotgun. He does not challenge that conviction here.

and possession of a short-barrel shotgun in Count 9. Andre Hankton was acquitted of murder in aid of racketeering in Count 7.

Telly Hankton, Kevin Jackson, and Andre Hankton now move for post-conviction acquittal and a new trial.[2] The Court considers first the motions for acquittal.

### I. Motions for Acquittal

Rule 29 of the Federal Rules of Criminal Procedure governs motions for judgment of acquittal. Such motions "challenge the sufficiency of the evidence to convict." United States v. Hope, 487 F.3d 224, 227 (5th Cir. 2007)(quoting United States v. Lucio, 428 F.3d 519, 522 (5th Cir. 2005)). Rule 29 obliges the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction" either on its own, or on the defendant's motion at the close of the government's evidence; the Court may reserve decision on the defendant's motion after the jury returns a verdict. Fed. R. Crim. P. 29(a), (b). After the jury verdict, a defendant may move for, or renew, a motion for judgment of acquittal. Fed. R. Crim. P. 29(c).

Rule 29 relief animates the Due Process Clause of the United States Constitution's Fourteenth Amendment, which forbids conviction "'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant]

---

[2] Walter Porter has not filed Rule 29 motions for acquittal or a motion for new trial.

is charged.'" See Jackson v. Virginia, 443 U.S. 307, 315
(1979)(citation omitted); see also In re Winship, 397 U.S. 358,
363 (1970)("The [reasonable doubt] standard provides concrete
substance for the presumption of innocence -- that bedrock
'axiomatic and elementary' principle whose 'enforcement lies at
the foundation of the administration of our criminal law.'").
Jackson v. Virginia fashioned the standard applicable to a
defendant's challenge to the sufficiency of the evidence:

> [T]he relevant question is whether, after viewing the
> evidence in the light most favorable to the prosecution,
> *any* rational trier of fact could have found the essential
> elements of the crime beyond a reasonable doubt.

443 U.S. 307, 318-19 and 319 n.13 (1979)(noting that "this inquiry
does not require a court to 'ask itself whether *it* believes that
the evidence at the trial established guilt beyond a reasonable
doubt'"; importantly, this "standard . . . does not permit a court
to make its own subjective determination of guilt or innocence;"
this "criterion . . . impinges upon 'jury' discretion only to the
extent necessary to guarantee the fundamental protection of due
process of law.")(citation omitted, emphasis in original); see
also United States v. Vargas-Ocampo, 747 F.3d 299, 301 (5th Cir.
2014)(*en banc*)(citing Jackson, 443 U.S. at 319); see also United
States v. Uvalle-Patricio, 478 F.3d 699, 701 (5th Cir. 2007)("the
evidence presented must allow the jury 'to find every element of
the offense beyond a reasonable doubt.'")(citation omitted). The

Court determines "only whether the jury made a rational decision, not whether its verdict was correct on the issue of guilt or innocence."  See United States v. Dean, 59 F.3d 1479, 1484 (5th Cir. 1995)(citation omitted); see also United States v. Isgar, 739 F.3d 829, 835 (5th Cir. 2014)(citation omitted).  In assessing rationality, the Court considers all evidence, all reasonable inferences drawn therefrom, and all credibility determinations in the light most favorable to the prosecution.  United States v. Ramos-Cardenas, 524 F.3d 600, 605 (5th Cir. 2008); United States v. Loe, 262 F.3d 427, 432 (5th Cir. 2001)(The jury "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of witnesses.").[3]

Notwithstanding this deferential, insulating standard, the Fifth Circuit instructs the Court to "consider the countervailing evidence as well as the evidence that supports the verdict" and credit "only 'reasonable inferences from the evidence[.]'"  See United States v. Moreland, 665 F.3d 137, 149 (5th Cir. 2011) (The Court "cannot 'credit inferences within the realm of possibility when those inferences are unreasonable[.]'")(citations omitted); but see United States v. Mendoza, 522 F.3d 482, 488 (5th Cir. 2008)("The evidence need not exclude every reasonable hypothesis

---

[3] The same test applies whether the government's case depends on direct or circumstantial evidence.  United States v. Thomas, 627 F.3d 146, 151 (5th Cir. 2010)(citation omitted).

of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence."). The Court also scrutinizes the verdict to ensure that it is not based "on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." Moreland, 665 F.3d at 149 (quoting United States v. Rojas Alvarez, 451 F.3d 320, 333 (5th Cir. 2006)). Nevertheless, "[c]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." United States v. Vasquez, 677 F.3d 685, 692 (5th Cir. 2012)(citations, emphasis omitted).

## A. Telly Hankton

At the close of evidence, counsel for Telly Hankton moved the Court for acquittal on certain overt acts. Counsel listed dozens of the 101 overt acts charged in Count 1 of the indictment urging that the government had failed to offer evidence to support the acts. Counsel submitted a written motion for acquittal on the overt acts to follow up the oral motion at trial. Counsel then added supplemental briefing re-urging the motion.

The Court first notes the oddity of Telly Hankton's motion. On this record, Hankton has not expressly moved for acquittal of any *counts* for which he was convicted. He only moves for "acquittal" of "certain overt acts." Of course, Hankton has not

7

been *convicted* of any overt acts. He stands convicted of certain specific *counts* of the indictment.

Telly Hankton relies on Federal Rule of Criminal Procedure 7, which provides, "Upon the defendant's motion, the court may *strike* surplusage from the indictment." (emphasis added). The Fifth Circuit has held, "While it is settled law in this circuit that a court may read an indictment in its entirety provided the jury is instructed that the indictment is not evidence, [in some circumstances], fair trial requirements mandate that the court parse the indictment and read to the jury only those overt acts covered by the evidence." United States v. Luffred, 911 F.2d 1011, 1016 (5th Cir. 1990). Nowhere does the Fifth Circuit suggest a defendant can be acquitted of overt acts after the jury returns a verdict. Not to mention the countless times the Court instructed the jury in this case that the indictment was not evidence, Telly Hankton's motion is effectively moot.[3]

Even though Hankton does not explicitly move for acquittal on any specific count for which he was convicted, he challenges the sufficiency of the evidence with regard to the murders of Darvin Bessie (Counts 5 and 6), Darnell Stewart (Counts 7 and 8), and

---

[3] The Court read the entire indictment to the jury on the first day of trial without objection by counsel. The defendant filed no motion to strike "surplusage" of the indictment before it was read to the jury. Moreover, the jury was not asked to determine any defendant's guilt as to any specific overt act. Nor was Telly Hankton convicted of any particular overt act.

Jesse Reed (Counts 10 and 11). The Court finds sufficient evidence for a rational jury to support Hankton's convictions on all of the murder counts.[4]

To start, Telly Hankton does not deny that evidence was offered at trial to support convictions on all of the murder charges. Rather, he simply attacks the credibility of the government's witnesses; the same attacks his counsel aggressively waged against the witnesses in front of the jury. For example, he seeks acquittal of the counts related to the murder of Darvin Bessie on the ground that the two eye witnesses to the murder are unreliable. Isaac Skinner and Tilicuis Irvin testified that they were sitting in a vehicle in front of the house where Bessie was shot. Skinner, who claimed he had known Telly Hankton for years, said that he clearly saw Hankton come out of the alley next to the house and shoot Darvin Bessie multiple times on the front porch. Skinner's account was detailed and largely corroborated by Irvin's testimony.

Defense counsel challenged Skinner's credibility on the stand. Counsel pointed out that Skinner was a convicted bank robber and that he was testifying with the hope of reducing his sentence. The jury heard all of this evidence at trial and chose to credit

---

[4] The Court wishes to underscore at this point that the jury in this trial was the most committed, attentive, and serious-minded regarding their public duty and service this Court has had the pleasure to work with.

9

the eyewitness accounts, a rational choice in light of the overwhelming evidence. The jury "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of witnesses." Loe, 262 F.3d at 432. The Court must consider all credibility determinations in the light most favorable to the prosecution. See Ramos-Cardenas, 524 F.3d at 605.

Similarly, Telly Hankton challenges the reliability of the two eye witnesses who identified him as the shooter in the Darnell Stewart murder. He points to supposed inconsistencies of the two eyewitness descriptions of the shooter, and he claims the witnesses were "total strangers" who observed the murder "under very stressful circumstances." Again, the jury heard at length the witnesses' descriptions of the shooter and the circumstances under which they observed the shooting. Both were credible witnesses who had no reason to lie. And both identified Telly Hankton as the shooter. One described his certainty as "absolute." The jury saw defense counsel attempt to discredit the witness identifications at trial. The jury weighed the abundant evidence and rationally concluded that Telly Hankton was the shooter. And they were instructed about witness credibility choices.

Finally, Telly Hankton challenges his convictions for the murder of Jesse Reed. As with his other contentions, he merely asks the Court to view the evidence in a light most favorable to him. He claims that witness testimony from convicted felons Aaron

Smith and Jerod Fedison, both of whom testified that Hankton wanted Jesse Reed dead, was unreliable. Quoting the cross-examination transcript from trial, Hankton points out that both witnesses admitted to previous lies they told to the government and others. He made the same argument in front of the jury.

Hankton also attempts to discredit Hasan Williams, an eyewitness to the Jesse Reed murder who stated in a recorded interview only hours after the shooting that he clearly saw Telly Hankton, who he had known for years, exit a vehicle and start shooting at Jesse Reed. Hankton claims that the involvement of former New Orleans Police Department detective Desmond Pratt, who is now under federal investigation for corruption, infects the reliability of Hasan Williams' recorded statement. But the defense called Desmond Pratt to the stand and asked him specific questions as to whether he framed Telly Hankton or coerced Hasan Williams' statement. The jury heard Pratt invoke his Fifth Amendment right against self-incrimination. By way of contrast, the jury also heard testimony of the two officers who actually conducted the interview of Hasan Williams. They both stated that Desmond Pratt was simply not present during the interview in which Williams identified Telly Hankton as the shooter.[5] The jury had substantial (indeed,

---

[5] Hankton attempts to impeach the officers' testimony by pointing out an inconsistency in their accounts as to who drove Hasan Williams to the police station. He did the same at trial in front

overwhelming) evidence to rationally find Telly Hankton guilty of the murder of Jesse Reed. Telly Hankton's motion for judgment of acquittal is denied.

## B. Kevin Jackson

Kevin Jackson moves for acquittal on Counts 1 and 10. Jackson was charged in Count 1 (RICO conspiracy), Count 2 (drug conspiracy), Count 3 (firearms conspiracy), Count 10 (murder in aid of racketeering), and Count 11 (causing death through use of a firearm). Jackson was convicted of the RICO conspiracy in Count 1 and murdering Jesse Reed in aid of racketeering in Count 10; the jury acquitted him of Counts 2, 3, and 11.

Jackson summarizes the government's evidence against him as follows:

> (1) cell phone records allegedly establishing that Kevin Jackson and Walter Porter exchanged 239 phone calls in the few weeks prior to the murder of Jesse Reed on June 20, 2009; (2) the testimony of Special Agent William C. Williams purportedly establishing that Kevin Jackson was in telephone contact with Walter Porter in the uptown neighborhood where Jesse Reed was killed approximately two hours before Reed's death on June 20, 2009; (3) the testimony of Jerod Fedison suggesting that he overheard a discussion between Porter and Jackson wherein they talked about murdering Reed; and (4) the testimony of Celestine Askia saying she saw Mr. Jackson pay Walter Porter for the killing of Jesse Reed.

Jackson focuses on one essential element required to sustain the conviction for murder in aid of racketeering:

---

of the jury. Hankton's affair with minutia did not persuade the jury, nor does it persuade the Court here.

> THAT THE DEFENDANTS' PURPOSE IN COMMITTING THE CRIME OF VIOLENCE WAS EITHER: 1) AS CONSIDERATION FOR THE RECEIPT OF, OR AS CONSIDERATION FOR A PROMISE OR AGREEMENT TO PAY, ANYTHING OF PECUNIARY VALUE FROM THE ENTERPRISE; OR 2) FOR THE PURPOSE OF GAINING ENTRANCE TO, OR MAINTAINING, OR INCREASING THEIR POSITION IN THE ENTERPRISE.

According to Jackson, the government offered no evidence that he: 1) received anything of pecuniary value from a racketeering enterprise; 2) was promised payment of anything of pecuniary value from a racketeering enterprise; or 3) conspired to murder Jesse Reed for the purpose of gaining entrance to a racketeering enterprise. At length, Jackson parses the testimony of Jerod Fedison and Celestine Askia to show the absence of the requisite motives: that he killed Jesse Reed for receipt of payment, promises, or to gain entrance into a racketeering enterprise.

Conspicuously absent, however, is any mention of the government's aiding and abetting charge. In addition to violating 18 U.S.C. § 1959(a)(1) for murder in aid of racketeering, Jackson was charged with violating 18 U.S.C. § 2, aiding and abetting.[6] The Court gave specific jury instructions on the essential elements necessary to convict a defendant of murder in aid of racketeering on a theory of aiding and abetting:

---

[6] In Count 10 of the indictment, after describing the charged offense, the last sentence provides, "all in violation of Title 18, United States Code, Sections 1959(a)(1) and 2." Section 2 is the aiding and abetting statute.

THE GUILT OF A DEFENDANT IN A CRIMINAL CASE MAY BE
ESTABLISHED WITHOUT PROOF THAT THE DEFENDANT PERSONALLY
DID EVERY ACT CONSTITUTING THE OFFENSE ALLEGED.
. . .

IF THE DEFENDANT JOINS ANOTHER PERSON AND PERFORMS ACTS
WITH THE INTENT TO COMMIT A CRIME, THEN THE LAW HOLDS
THE DEFENDANT RESPONSIBLE FOR THE ACTS AND CONDUCT OF
SUCH OTHER PERSONS JUST AS THOUGH THE DEFENDANT HAD
COMMITTED THE ACTS OR ENGAGED IN SUCH CONDUCT.
. . .

FOR YOU TO FIND THE DEFENDANT GUILTY OF THIS CRIME,
YOU MUST BE CONVINCED THAT THE GOVERNMENT HAS PROVED
EACH OF THE FOLLOWING BEYOND A REASONABLE DOUBT:

**FIRST**: THAT THE OFFENSE OF COMMITTING A VIOLENT CRIME IN
AID OF RACKETEERING AS CHARGED IN [COUNT 10] WAS
COMMITTED BY SOME PERSON;

**SECOND**: THAT THE DEFENDANT ASSOCIATED WITH THE CRIMINAL
VENTURE;

**THIRD**: THAT THE DEFENDANT PURPOSEFULLY PARTICIPATED IN
THE CRIMINAL VENTURE; AND

**FOURTH**: THAT THE DEFENDANT SOUGHT BY ACTION TO MAKE THAT
VENTURE SUCCESSFUL.

Under a theory of aiding and abetting, the jury was not
required to find that the government proved Kevin Jackson
personally committed every element of murder in aid of
racketeering. Rather, the government was obliged to prove beyond
a reasonable doubt that Jackson actively participated in a criminal
venture with *someone* who satisfied every element of murder in aid
of racketeering. Jackson was convicted in Count 10 with both Telly
Hankton and Walter Porter. Jackson does not contest his co-
defendants' guilt of murder in aid of racketeering. And reasonably

14

so: the testimonial evidence he relies on in his own motion bolsters Walter Porter's conviction. The jury had reliable evidence to find Kevin Jackson guilty of murder in aid of racketeering on a theory of aiding and abetting. Jackson's motion for acquittal of Count 10 is denied.[7]

---

[7] The day before oral argument, Jackson submitted additional briefing on the issue of aiding and abetting. He does not contest the sufficiency of the evidence for a conviction under such theory. Instead, he claims that the jury instructions contained plain error because there was no unanimity requirement instructing the jury that they must unanimously agree as to whether Jackson was guilty of murder in aid of racketeering or aiding and abetting murder in aid of racketeering. He relies on United States v. Correa-Ventura, 6 F.3d 1070 (5th Cir. 1993), in which the Fifth Circuit engages in a thoughtful analysis of the so-called "unanimity rule," but ultimately offers no clear test to determine when a unanimity instruction is required. But in that case, the Court concluded that a jury did not need to unanimously agree on the particular firearm, out of many seized, that the defendant used in furtherance of a drug trafficking crime to find him guilty of the crime. Here, Jackson contends that aiding and abetting is fundamentally a different crime than the underlying murder in aid of racketeering charge. Disagreeing, the government contends that aiding and abetting is merely an alternate theory of liability that leads to the same result as a conviction on the underlying charge. Without squarely deciding the issue, the Fifth Circuit has endorsed the government's view: "Under the general aiding and abetting statute, a person who aids and abets the commission of an offense is treated the same as a principal actor. . . . Cabining the defendant's role in a particular box is unnecessary. In fact, the jury will seldom be asked to make an independent determination of whether the defendant committed the offense as a principal or as an aider and abettor. Both are sufficient for conviction; both are treated the same for punishment." See United States v. Williams, 449 F.3d 635, 647-48 (5th Cir. 2006). The Court gave the jury specific instructions on the elements of both murder in aid of racketeering and aiding abetting. Jackson was not denied due process by the absence of a specific finding of his exact role in the crime.

Jackson also moves for a judgment of acquittal on Count 1, the RICO conspiracy.

The jury instructions on the RICO conspiracy were necessarily lengthy and complex. The Court, however, summarized the essential elements of the RICO conspiracy at the beginning and the end of the instruction as follows:

> FOR THE DEFENDANT[] . . . TO BE FOUND GUILTY OF THE RICO CONSPIRACY CHARGED IN COUNT 1 OF THE THIRD SUPERSEDING INDICTMENT, THE GOVERNMENT MUST PROVE EACH OF THE FOLLOWING BEYOND A REASONABLE DOUBT:
>
> > **FIRST:**  THAT TWO OR MORE PEOPLE AGREED TO COMMIT A SUBSTANTIVE RICO OFFENSE; AND
> >
> > **SECOND:**  THAT THEY KNEW OF AND AGREED TO THE OVERALL OBJECTIVE OF THE RICO OFFENSE.
>
> THE SUBSTANTIVE RICO OFFENSE THAT IS THE OBJECT OF THE CONSPIRACY CHARGED IN COUNT 1 IS TO PARTICIPATE IN THE CONDUCT OF AN ENTERPRISE'S AFFAIRS THROUGH A PATTERN OF RACKETEERING ACTIVITY. I WILL NOW EXPLAIN THE ELEMENTS OF THE RICO VIOLATION, WHICH IS THE OBJECT OF THE CONSPIRACY CHARGED IN COUNT 1.
>
> > PLEASE BEAR IN MIND THAT, FOR YOU TO FIND THE DEFENDANTS, TELLY HANKTON, WALTER PORTER, AND KEVIN JACKSON, GUILTY OF THE CONSPIRACY CHARGED IN COUNT 1, YOU NEED NOT FIND THAT THEY ARE GUILTY OF THE SPECIFIC OBJECT OF THE CONSPIRACY. RATHER, YOU MUST FIND BEYOND A REASONABLE DOUBT THAT THEY ARE GUILTY OF CONSPIRACY TO COMMIT THE ALLEGED OBJECT OF THE CONSPIRACY, A RICO VIOLATION.
> > . . .
>
> A RICO CONSPIRACY DOES NOT REQUIRE THAT THE CONSPIRATOR HAVE COMMITTED OR AGREED TO PERSONALLY COMMIT THE TWO PREDICATE RACKETEERING ACTS. RATHER, THE GOVERNMENT NEED ONLY PROVE BEYOND A REASONABLE DOUBT THAT THE DEFENDANTS, TELLY HANKTON, WALTER PORTER, AND KEVIN JACKSON, KNEW OF AND AGREED TO THE OVERALL OBJECTIVE OF

THE RICO OFFENSE AND THAT ONE OF THE CONSPIRATORS COMMITTED TWO RACKETEERING ACTS.

Jackson argues that the jury's verdict was irrational and that there was no evidence that he knew of or agreed to the overall objective of the RICO offense.

Jackson's first theory – that the jury's verdict is irrational – is premised on an assumption that there was insufficient evidence to convict him of murder in aid of racketeering in Count 10. Jackson relies on the verdict form, which indicates that the jury found that he "committed and/or aided and abetted the commission of the June 20, 2009, murder of Jesse Reed," but he did not participate in the distribution of drugs. If Jackson's conviction of the Jesse Reed murder is insufficient, the theory goes, then there is no basis on which the jury could have convicted him in Count 1. But there was certainly evidence for a jury to rationally conclude that Jackson aided and abetted in the murder of Jesse Reed. His first argument fails.

Jackson also claims that the jury's guilty verdict on Count 1 cannot stand for lack of evidence that he agreed to the overall objective of the racketeering offense. Jackson rejects the fact that the 239 phone calls between him and alleged hitman Walter Porter (20 of which occurred on the day of Reed's murder) are sufficient to support a conviction. He then attacks the credibility of two government witnesses, Jerod Fedison and Celestine Askia,

who both testified that they overheard conversations between Porter and Jackson in which the two discussed their participation in Reed's murder. Askia also claimed that she saw Jackson pay Porter $20,000 for the hit. Jackson accurately points out numerous inconsistencies in both of their statements and urges that both witnesses were self-proclaimed liars and manipulators. He contends, with some justification, that neither witness was credible. But the jury did not have to rely on the possibly suspect testimony of Fedison or Askia to reach a guilty verdict in Count 1.

Contrary to Jackson's argument, the telephone evidence linking him to the murder of Jesse Reed was overwhelming. Government witness Aaron Smith testified that he introduced Telly Hankton to Walter Porter on June 10, 2009, a day Smith remembered well because he was arrested later that night. The purpose of the introduction, according to Smith, was to introduce crime boss Telly Hankton to hitman Walter Porter to set up the murder of Jesse Reed. On that same day when Porter and Hankton were introduced, phone records unequivocally establish that Kevin Jackson's contact number appeared in Porter's phone for the very first time. Then, over the next 13 days – the days leading up to and directly following Reed's murder – Porter and Jackson communicated by phone 239 times, 20 times on the day of the murder.

The jury also heard the expert testimony of FBI Agent William Williams. The agent used cell phone towers to map the locations of both Porter and Jackson during the time surrounding Reed's murder. He was able to place Jackson and Porter within a few blocks of each other in the hours leading up to the murder. They were in close proximity to the scene where Jesse Reed was shot. "Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." Vasquez, 677 F.3d at 692. Based on Aaron Smith's introduction of Telly Hankton and Porter for the purpose of killing Reed, the coinciding, immediate appearance of Jackson's telephone number in Porter's phone, the timing and quantity of Jackson and Porter's numerous contacts, and the location of Porter and Jackson in the hours surrounding the shooting, the jury could rationally and reasonably infer that Jackson agreed and aided in the overall objective of the RICO offense: to murder Jesse Reed in furtherance of the criminal enterprise. Jackson's motion for acquittal on Count 1 is denied.

## C. Andre Hankton

Andre Hankton moves for judgment of acquittal for Counts 3 and 8 of the indictment. He contends that it was irrational and inconsistent for the jury to convict him of causing the death of Darnell Stewart through the use of a firearm while at the same

time acquitting him of murder in aid of racketeering. Hankton relies on the Court's instructions on the essential elements for a conviction on Count 8:

> **FIRST:**    THAT THE DEFENDANT COMMITTED THE CRIME CHARGED IN COUNT 1 <u>OR</u> COUNT 2.
>
> **SECOND:**    THAT THE DEFENDANT KNOWINGLY USED OR CARRIED A FIREARM DURING AND IN RELATION TO THE COMMISSION OF THE CRIME OF VIOLENCE CHARGED IN COUNT 1 <u>OR</u> THE DRUG TRAFFICKING CRIME CHARGED IN COUNT 2;
>
> **THIRD:**    THAT THE DEFENDANT CAUSED DEATH THROUGH THE USE OF A FIREARM DURING AND IN RELATION TO COMMITTING THE CRIME OF VIOLENCE CHARGED IN COUNT 1 OR THE DRUG TRAFFICKING CRIME CHARGED IN COUNT 2;
>
> **FOURTH:**    THE KILLING WAS A MURDER.

Andre Hankton correctly asserts that he was not charged in Counts 1 or 2. Based on this premise, however, he reaches an incorrect conclusion: "The only way a rational jury could have concluded that Andre Hankton 'committed the crime charged in Count 1,' which is the requisite finding for guilt on Count 8, is if that jury first found Andre Hankton guilty of the murder of Darnell Stewart [in aid of racketeering]." Andre Hankton ignores entirely the government's charge of aiding and abetting.

The Court gave specific instructions on the essential elements to find a defendant guilty of causing death through the use of a firearm on a theory of aiding and abetting:

> **FIRST**: THAT THE OFFENSE OF CAUSING DEATH THROUGH THE USE OF A FIREARM AS CHARGED IN [COUNT 8] WAS COMMITTED BY SOME PERSON;
>
> **SECOND**:  THAT THE DEFENDANT ASSOCIATED WITH THE CRIMINAL VENTURE;

**THIRD**:  THAT THE DEFENDANT ACTIVELY PARTICIPATED IN THE CRIMINAL VENTURE WITH ADVANCE KNOWLEDGE THAT SOMEONE ELSE INVOLVED IN THE CRIME OF VIOLENCE OR DRUG TRAFFICKING CRIME WOULD USE OR CARRY A FIREARM DURING AND IN RELATION TO THE CRIME OF VIOLENCE OR DRUG TRAFFICKING CRIME; AND

**FOURTH**: THAT THE DEFENDANT SOUGHT BY ACTION TO MAKE THAT VENTURE SUCCESSFUL.

Andre Hankton does not seriously contest his involvement in the murder of Darnell Stewart. Video evidence produced at trial captured most of the incident on camera. The jury watched as a silver Ford Mustang sped down Claiborne Avenue and struck Darnell Stewart sending him flying high into the air. The jury heard from the police officer who stopped the Mustang only blocks from the murder scene, the front windshield smashed and the front end damaged. Andre Hankton was the driver and only occupant. The jury listened to a recorded 911 phone call in which an eye witness gave a real-time account of the gun-blazing car chase, the attempt by Darnell Stewart to abandon his vehicle and flee on foot, the passenger exiting the Mustang in pursuit, the Mustang looping back around, smashing into Stewart before speeding off, and the Mustang's passenger standing over Stewart's body, unloading a pistol clip at point blank. Two eye-witnesses identified the shooter as Telly Hankton.

The evidence against Andre Hankton was overwhelming. Under an aiding and abetting theory, Andre Hankton need not personally

satisfy every element of Count 8. He need only actively participate to advance a criminal venture in which *someone* causes death through the use of a firearm. Here, Telly Hankton was also convicted of Count 8. The jury had evidence to find that the government proved beyond a reasonable doubt every element of causing death through the use of a firearm as to Telly Hankton. And Andre Hankton does not contend otherwise. Accordingly, it was entirely rational for the jury to find, as they did, that Andre Hankton aided and abetted Telly Hankton's commission of the murder. As the government puts it, "hitting a fleeing victim with a car so that an associate who is chasing the victim can catch up to him and shoot him is almost the quintessential definition of aiding and abetting." Andre Hankton's motion for judgment of acquittal for Count 8 is denied.

Andre Hankton also moves for acquittal on Count 3, conspiracy to use and carry and to possess firearms. The Court gave the following instructions on the elements of that crime:

> **FIRST:** THAT THE DEFENDANT AND AT LEAST ONE OTHER PERSON MADE AN AGREEMENT TO USE OR CARRY A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE CHARGED IN COUNT 1 OR A DRUG TRAFFICKING CRIME CHARGED IN COUNT 2 OR TO POSSESS A FIREARM IN FURTHERANCE OF SUCH CRIMES;

> **SECOND:** THAT THEY KNEW THE UNLAWFUL PURPOSE OF THE AGREEMENT; AND

> **THIRD:** THAT THE DEFENDANT JOINED IN IT WILLFULLY, THAT IS, WITH THE INTENT TO FURTHER THE UNLAWFUL PURPOSE.

The Court gave detailed instructions to define "conspiracy," including:

> A "CONSPIRACY" IS AN AGREEMENT BETWEEN TWO OR MORE
> PERSONS TO JOIN TOGETHER TO ACCOMPLISH SOME UNLAWFUL
> PURPOSE. IT IS A KIND OF "PARTNERSHIP IN CRIME" IN WHICH
> EACH MEMBER BECOMES THE AGENT OF EVERY OTHER MEMBER.

Andre Hankton contends that it is inconsistent and irrational for the jury to find him guilty of Count 3 because the government cannot satisfy the first element. He urges that he could not have agreed to carry or possess a firearm in furtherance of a crime of violence in Count 1 or a drug trafficking crime in Count 2 because he was neither charged nor convicted in either of those Counts.

Andre Hankton stands convicted of causing the death of Darnell Stewart through the use of a firearm in furtherance of a crime of violence and drug trafficking crime. As explained above, evidence was introduced at trial to support his conviction on a theory of aiding and abetting. Significantly, when Andre Hankton was pulled over in his smashed Mustang only blocks away from the murder scene of Darnell Stewart, police officers found him in possession of a firearm. Although there was no evidence showing that Andre Hankton ever shot the gun, the jury could nonetheless have found that he agreed with Telly Hankton to possess or carry the gun in furtherance of the murder.[8] As the Court instructed the jury:

> THE "CARRYING" OF A FIREARM DURING AND IN RELATION
> TO A CRIME OF VIOLENCE OR DRUG TRAFFICKING CRIME MEANS
> THAT A DEFENDANT "CARRIED" THE FIREARM IN THE ORDINARY
> MEANING OF THE WORD "CARRY," SUCH AS BY TRANSPORTING A

---

[8] Andre Hankton was also stopped by police officers who found him in possession of a sawed-off shotgun and a stolen pistol while he was out on bond for the Darnell Stewart murder.

FIREARM ON THE PERSON OR IN A VEHICLE.  THE DEFENDANT'S CARRYING OF THE FIREARM CANNOT BE MERELY COINCIDENTAL OR UNRELATED TO THE CRIME OF VIOLENCE OR DRUG TRAFFICKING CRIME.

It is not necessary that Andre Hankton be convicted in Counts 1 or 2 for the jury to find that he agreed to possess a firearm in furtherance of those counts. The jury could properly find him guilty of the firearm conspiracy so long as he willfully joined (or aided) his co-conspirator or "partner in crime," Telly Hankton, who *did* murder Darnell Stewart in furtherance of Counts 1 or 2. The evidence at trial established Andre Hankton's guilt. His motion for acquittal on Count 3 is denied.

## II. Motions for New Trial

Rule 33 of the Federal Rules of Criminal Procedure allows a trial court, upon a defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  Disfavored, Rule 33 motions are viewed "with great caution." See United States v. Infante, 404 F.3d 376, 387 (5th Cir. 2005).

In the Fifth Circuit, "a new trial ordinarily should not be granted 'unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict.'"  United States v. Wright, 634 F.3d 770, 775 (5th Cir. 2011)(citations omitted); see also United States v. Robertson, 110 F.3d 1113, 1120 n. 11 (5th Cir. 1997)("It has been said that on such a motion [for

new trial] the court sits as a thirteenth juror. The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial . . . should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.").[9]  "A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant." United States v. Wall, 389 F.3d 457, 466 (5th Cir. 2004)(citation omitted).  The Court lacks "authority to grant a motion for a new trial under Rule 33 on a basis not raised by the defendant." United States v. Shoemaker, 746 F.3d 614, 631-32 (5th Cir. 2014)(citation omitted).

Unlike the cramped standard applicable to Rule 29 motions, the Court has broad discretion to "carefully weigh the evidence and may assess the credibility of the witnesses during its consideration of the motion for new trial." United States v. Herrera, 559 F.3d 296, 302 (5th Cir. 2009)(quoting United States v. Tarango, 396 F.3d 666, 672 (5th Cir. 2005)); United States v. Shoemaker, 746 F.3d 614, 631-32 (5th Cir. 2014)("The 'interest of justice' may take into account 'the trial judge's evaluation of witnesses and weighing of the evidence'", but the Court "may not reweigh the evidence and set aside the verdict simply because it

---

[9] But see United States v. O'Keefe, 128 F.3d 885, 898 (5th Cir. 1997)("The grant of a new trial is necessarily an extreme measure, because it is **not** the role of the judge to sit as a thirteenth member of the jury.")(emphasis added).

feels some other result would be more reasonable.")(citations omitted). A new trial may be appropriate where the evidence "tangentially supports a guilty verdict, but in actuality, the evidence preponderates sufficiently heavily against the verdict such that a miscarriage of justice may have occurred." Tarango, 396 F.3d at 672 (citations omitted). However, the Court still "must not entirely usurp the jury's function or simply set aside a jury's verdict because it runs counter to [the] result the district court believed was more appropriate." Id. (citations omitted). Rather, the Court should set aside a jury's guilty verdict in the interests of justice only when exceptional circumstances are present. See id.; see also United States v. Poole, 735 F.3d 269, 279 (5th Cir. 2013)("Rule 33 case law cannot be understood except through the lens of avoiding the injustice of a compromised verdict.").

## A. Telly Hankton

Telly Hankton's motion for a new trial relies almost exclusively on speculative and tenuous claims of Brady violations.

The bulk of the supposed Brady violations stems from defense counsel's post-trial interview of Rodney Robinson, a recurring figure throughout the trial. Robinson signed a post-trial statement that Hankton now uses to attempt to discredit the government's theory of prosecution. In opening and closing statements, the prosecutors referred to a specific incident that

supposedly led to a years-long turf war between Telly Hankton and some of the murder victims in the case. The incident involved an argument between Telly Hankton and Brian Broussard. Hankton told Broussard to quit selling heroin on Hankton's aunt's porch, and Broussard apparently refused. This "altercation," according to the government, resulted in a fatal feud that left many dead, including Broussard's associates, Darnell Stewart and Jesse Reed. The government also accused Telly Hankton of later shooting both Broussard and Robinson. Hankton was not formally charged for the shootings, but they were listed as overt acts in indictment. Notably, Broussard's name was explicitly mentioned in the indictment, Robinson's was not.

Robinson was a close friend of Broussard. Telly Hankton attaches Robinson's post-trial statement to his motion for a new trial. After praising Telly as an encouraging role model, Robinson states that he witnessed the argument between Telly and Broussard (a/k/a Pluck). Robinson claims he laughed when he saw Telly and Pluck arguing "because we all grew up together and knew they wouldn't hurt each other." He adds that a month later, he and Pluck saw Telly on Canal Street and "everything seemed normal with Telly and Pluck." He says he could not identify who it was that shot him and Pluck, but he never told police that it was Telly, nor did he think that it was Telly. "Telly and Pluck were like family to me.

27

I never heard Pluck threaten or plan to kill Telly. Telly and Pluck weren't beefing."

Robinson also claims that federal agents visited him twice, once in 2011 or 2012 and later in 2014. With regard to the first visit, he states:

> I told the agents I didn't know who shot me and Pluck. I told the agents I thought the man who shot us was trying to rob us. I told the agents that Pluck and Telly saw each other three or four times after the argument between Pluck and Telly. I told the agents Telly and Pluck were cool. I told the agents I didn't think Telly ever tried to kill Pluck.

When the agents visited him again in 2014, he adds:

> I told the agents the same thing I told them in 2012. The agents told me that they could have me out of jail that day if I testified. I told the agents I wasn't willing to lie on someone. The agents said they were going to fry Telly with or without me.

Based on this statement, Hankton contends that Robinson would have been a "powerful witness" for Hankton's defense. He charges that Robinson's testimony would have undercut the government's theory of the case and contradicted testimony of government witnesses.

The government admits that case agents Beau Barker and Keith Burriss interviewed Robinson on two occasions. According to the government, Robinson refused to talk about any of the events in the case and expressed a desire not to be involved. The government claims that "the interactions with Robinson were so brief and uneventful, the agents did not write a report because there was no

28

investigative value, positive or negative, to memorialize from the agents questions of Robinson." The government attaches a sworn statement of the FBI Agent to that effect. The government submits that it had no <u>Brady</u> material to turn over to the defendants because Robinson did not provide any information he now asserts in his post-trial statement.

Even so, the government points out that it turned over numerous discovery documents related to the Robinson and Broussard shootings, including police narratives, crime scene reports, and medical reports. Although Robinson's name was redacted on the police documents, his name was not redacted on medical documents, which showed that Robinson was a victim in the shooting. Nonetheless, Hankton contends that Robinson's name was only sparsely mentioned in the thousands of discovery documents that the government turned over. He claims that he had no way of knowing that Robinson was an important figure in the government's case until the start of trial. The government responds, however, that the defendants were not entitled to any detailed preview of the government's theory of the case. The government claims that defense counsel had ample time to interview Robinson or subpoena him to testify before trial.

Moreover, the Court points out that numerous subpoenas were issued on behalf of Telly Hankton and his co-defendants *during* the course of the three week trial. Accordingly, even once the trial

began and Hankton learned of the government's theory about Robinson's role in the case, he *still* could have subpoenaed or interviewed Robinson, who is currently in jail at Orleans Parish Prison, only blocks away from the federal courthouse.

Finally, Telly Hankton overstates the significance of Robinson's would-be testimony. Hankton claims that Robinson's statements discredit the government's evidence regarding the murder of Darvin Bessie because the jury may have believed Robinson's testimony over the testimony of the government witnesses. At best, it is wishful thinking that a witness like Robinson would have saved Hankton from conviction. Two eyewitnesses, who had no apparent connection to Robinson, testified that Telly Hankton was the shooter of Darvin Bessie. Hankton had a fair opportunity to impeach the eyewitness testimony. Many witnesses testified about the feud between Hankton, Broussard, and Broussard's associates, Darnell Stewart and Jesse Reed. And Robinson's statements do not discredit testimony of the eyewitnesses to the Darnell Stewart and Jesse Reed homicides. Two credible, non-prisoner witnesses identified Telly Hankton as the gunman in the Darnell Stewart murder. And another eyewitness, Hasan Williams, who was later himself murdered, identified Telly Hankton with certainty as one of Jesse Reed's shooters. Robinson's unvetted, after-the-fact statements do not undercut the bulk of the government's overwhelming evidence against Telly Hankton.

30

Hankton also asserts that the government violated Brady by withholding exculpatory information regarding former NOPD detective Desmond Pratt. Pratt was the lead homicide detective in the Jesse Reed murder. He was, and may still be, under investigation by the Department of Justice for fabricating evidence, coercing witnesses, and other corrupt conduct. In May of 2015, the prosecutors disclosed the DOJ investigation to the defendants, and provided specific details and FBI reports of revelations impacting this case. The government also turned over information on Pratt's misdeeds in other, unrelated cases. Hankton speculates, at best, that the government has withheld further information about Pratt.

The Court has ordered the government to turn over all Brady material implicating Detective Pratt numerous times throughout this years-long litigation, including once again during trial. Aside from Hankton's wishful thinking, nothing creates even a hint that the government withheld information regarding Pratt.[10] To the contrary, the government discovered Pratt's misconduct and turned over detailed information of its findings over a year before trial.

---

[10] At oral argument, counsel for Hankton complained that Pratt's former colleagues at the New Orleans Police Department and the District Attorney's office were not adequately questioned about Pratt's misconduct. Several of Pratt's former colleagues, however, testified as witnesses in the case. They were subject to defense counsel's cross examination. Hankton had an opportunity to ask the very questions he claims the government should have asked.

Hankton's disappointment that the results of the DOJ investigation did not deal him a get-out-of-jail-free card does not mean that the government concealed one. And while Pratt's misconduct was a factor in the case, Hankton has doggedly exaggerated its impact. Few, if any, of the government's material witnesses had even heard of Pratt, although defense counsel asked every single one. Hankton's desire for the government's entire case to unravel on a speculative conspiracy theory involving Pratt's crooked conduct is farfetched conjecture. And not a basis for a new trial.

Finally, Hankton asserts that the government relied on facts that were not in evidence during its closing argument as ground for a new trial. The prosecutor stated:

> The victims in this case are: Brian Broussard/Pluck, who Telly Hankton began shooting back in 2004; Rodney Robinson/Doo-doo, who Telly Hankton began shooting back in 2004; Venice Brazley, the cousin who stole Telly Hankton's drugs out of her father's home, who he had executed back in 2000 . . . .

Hankton contends that the government did not provide evidence sufficient to support the allegation that he had Venice Brazley executed. He acknowledges, however, that a government witness, Latoya Stewart, testified that Hankton stated that he was going to kill "Frank's daughter" for stealing drugs. Other witnesses established that Frank Hankton was Telly's uncle. The government adds that another witness, Deryl Nicholas, testified that Frank's

daughter was in fact killed. The jury saw photographs of the crime scene.

The Court instructed the jury as follows: "evidence is the sworn testimony of the witnesses, including stipulations, and the exhibits. The questions, statements, objections, and arguments made by the lawyers is not evidence." District courts have broad discretion in determining whether closing arguments are prejudicial or inflammatory. See United States v. Palmer, 37 F.3d 1080, 1085 (5th Cir. 1994). Evidence was offered to support the government's statement that Hankton played a role in the murder of Venice Brazley. Whether the evidence was sufficient for a conviction is irrelevant; Hankton was not charged for the murder and the jury was not asked to find him guilty of it. The list of murder victims in this case was long. The prosecutor's statements in closing argument were not prejudicial. Hankton's motion for a new trial is denied.

## B. Kevin Jackson

Kevin Jackson moves for a new trial on the basis that he was overly prejudiced by the joint trial with his co-defendants and his case should have been severed. Jackson has filed previous motions to sever before trial, which the Court denied with written reasons.

Jackson accurately points out that he was named in only two of the 101 overt acts listed in the indictment, both involving the

murder of Jesse Reed. He is also correct that he was named in only five counts of the 24-Count third superseding indictment. He stands convicted of two counts: the RICO conspiracy in Count 1 and the murder of Jesse Reed in aid of racketeering in Count 10.

1.

Rule 8(b) of the Federal Rules of Criminal Procedure allows multiple defendants to be charged in the same indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The Rule specifies, however, that "[a]ll defendants need not be charged in each count." Id. It is the rule in this Circuit that persons indicted together should be tried together, especially in conspiracy cases. See United States v. McRae, 702 F.3d 806, 821 (5th Cir. 2012). But "the government need not allege a conspiracy in order to join defendants or counts." Id. at 820 (quoting United States v. Dennis, 645 F.2d 517, 520 (5th Cir. 1981). "Instead, [w]hat is required is a series of acts unified by some substantial identity of facts or participants." Id. (internal quotations omitted).

Rule 14 of the Federal Rules of Criminal Procedure recognizes the possibility that defendants who are properly joined under Rule 8 may nonetheless be unfairly prejudiced. The Rule thus provides, if joinder "appears to prejudice the defendant or the government, the court may order separate trials of counts, sever the

defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). It is the resounding preference of federal courts, however, to jointly try defendants who are indicted together. See Zafiro v. United States, 506 U.S. 534, 537 (1993). "It is the rule, therefore, not the exception, that persons indicted together should be tried together, especially in conspiracy cases." McRae, 702 F.3d at 821. The Court must weigh its interest in judicial economy against the risk of prejudice to a defendant in deciding whether a joint trial is appropriate. See Zafiro, 506 U.S. at 537.

This Circuit does not reflect a generous attitude toward severance. "Severance is proper only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." McRae, 702 F.3d at 822 (internal quotations omitted). Less drastic measures, such as limiting jury instructions, "often will suffice to cure any risk of prejudice." Zafiro, 506 U.S. at 539; United States v. Daniels, 281 F.3d 168, 177 (5th Cir. 2002). Finally, this Court has broad discretion in determining whether severance is appropriate: "The denial of a severance motion will be reversed only for abuse of discretion, upon a showing of specific and compelling prejudice." United States v. Erwin, 793 F.2d 656, 665 (5th Cir. 1986). Here,

Kevin Jackson relies heavily on the Fifth Circuit decision in McRae.

In United States v. McRae, 702 F.3d 806 (5th Cir. 2012), the Fifth Circuit held that David Warren, the police officer who shot Henry Glover in the infamous post-Katrina cover-up killing, should have been severed from the other two officers who burned Glover's body and fabricated a cover-up police report. Although Warren was the shooter, it was not alleged that he played any role in the crimes of his co-defendants. The Court found that, if Warren had been tried alone, the trial would have lasted three days. Instead, Warren was subjected to a month-long trial in which inflammatory evidence was introduced about the burning of Glover's body and the attempt by fellow officers to hide their crimes by falsifying a police report. Notably, the government did not charge the defendants with conspiracy. The appellate Court found, however, that the government inappropriately treated the defendants as conspirators, making it difficult for any jury to compartmentalize the evidence separately for each defendant. The court concluded, "We do not fault the district court for declining to sever Warren's case before trial, but as the trial progressed, however, and the evidence and testimony presented became irrelevant and unusable against Warren, and increasingly inflammatory to him, we are of the belief that limiting instructions could not mitigate the prejudice." Id. at 828.

36

2.

Jackson compares himself to Warren in the McRae case. He contends that, like Warren, if the government had prosecuted Jackson separately, the trial would have lasted days instead of weeks. He finds troubling "the voluminous evidence introduced at trial implicating [his] co-defendants in cold-blooded murder and gang activity." He claims further that "the jury was also exposed to hearsay statements that may not be admissible in a trial only against Mr. Jackson." He contends that there is no limiting instruction that could have defused the prejudicial nature of the evidence introduced against his co-defendants at trial. The Court disagrees. Jackson's argument is a perversion of McRae.

Unlike McRae, this was a conspiracy case. Jackson was charged and convicted in Count 1, the RICO conspiracy that consumed the bulk of the trial. He was also charged and convicted of murdering Jesse Reed in furtherance of the racketeering enterprise. The Jesse Reed homicide was a significant event in the government's theory of the RICO conspiracy. It was the first charged murder implicating both Walter Porter and Telly Hankton: alleged hitman and crime boss. Jackson stands convicted of participating in the murder with his co-defendants, Porter and Telly Hankton. Jesse Reed was shot 50 times in cold blood as he fled a front porch where he was eating dinner in his neighborhood. That the jury heard evidence of other

"cold-blooded murder and gang activity" unrelated to Jackson was not unduly prejudicial.

The Court instructed the jury numerous times throughout the trial that they must consider each defendant separately. In its final instructions the Court added:

> EACH COUNT, AND THE EVIDENCE PERTAINING TO IT, SHOULD BE CONSIDERED SEPARATELY. THE CASE OF EACH DEFENDANT SHOULD CONSIDERED SEPARATELY AND INDIVIDUALLY. THE FACT THAT YOU MAY FIND ONE OR MORE OF THE ACCUSED GUILTY OR NOT GUILTY OF ANY OF THE CRIMES CHARGED SHOULD NOT CONTROL YOUR VERDICT AS TO ANY OTHER CRIME OR ANY OTHER DEFENDANT. YOU MUST GIVE SEPARATE CONSIDERATION TO THE EVIDENCE AS TO EACH DEFENDANT.

Notably, the jury convicted Jackson on only two of the five counts for which he was charged, a strong indication that they gave careful and separate consideration of the evidence against each defendant. Jackson's motion for severance and a new trial is denied.

### C. Andre Hankton

Andre Hankton moves for a new trial on the same grounds for which he seeks acquittal. He offers no additional argument, and instead, simply references his motion for judgment of acquittal. For the same reasons the Court denies Andre Hankton's motion for acquittal, his motion for a new trial is denied.

New Orleans, Louisiana, August 25, 2016

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE